IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD W. BROWN,<br><br>    Petitioner,<br><br>  v.<br><br>A. P. KANE, Warden, et al.,<br><br>    Respondents._____/ | No. C 05-5188 CRB (PR)<br><br>ORDER GRANTING PETITION FOR A WRIT OF HABEAS CORPUS |

    Petitioner Richard Brown, a state prisoner incarcerated at the Correctional Training Facility in Soledad, California, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging Governor Schwarzenegger's February 15, 2005 revocation of his grant of parole by the Board of Prison Terms ("BPT"). Brown claims that the Governor's decision is not supported by the evidence. For the reasons set forth below, the petition will be granted.

**BACKGROUND**

    On November 11, 1979, at the age of 22, Brown shot and killed Lester McLucas. The previous day, Brown lost $500 to McLucas in a card game. Although he gave McLucas some money, Brown still owed McLucas approximately $370. On the day of the murder, McLucas went to Brown's apartment to collect the debt. Brown and another man left with

G:\PRO-SE\CRB\HC.05\Brown1.grant.wpd

McLucas to visit a mutual friend. After the visit, they continued on toward the home of Brown's mother. Brown gave directions from the back seat and told McLucas to pull into a carport. Once inside the carport, Brown held a gun behind McLucas's head and demanded "the money." McLucas was directed to give the money in his wallet to the other passenger, who then handed the money to Brown. The passenger ran from the scene. McLucas died from multiple gunshot wounds to the head.

Brown turned himself into authorities two days later. He was convicted by a jury in the Superior Court of the State of California in and for the County of Ventura of second degree murder and, on August 1, 1980, was sentenced to 15 years to life in state prison with the possibility of parole.

Brown was found not suitable for parole the first nine times he appeared before the BPT. At his tenth hearing on September 28, 2004, the BPT found Brown suitable for parole and set a parole date; however, the Governor reversed the BPT's parole suitability determination and revoked the parole date on the ground that Brown would pose an unreasonable risk to public safety based on the circumstances of the commitment offense.

After unsuccessfully challenging the Governor's decision in the state courts, Brown sought federal habeas relief under 28 U.S.C. § 2254 in this court. Per order on March 24, 2006, the court found that the petition appeared to state cognizable claims under § 2254, when liberally construed, and ordered respondents to show cause why a writ of habeas corpus should not be granted. Respondents have filed an answer to the order to show cause and Brown has filed a traverse.

**STANDARD OF REVIEW**

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a

G:\PRO-SE\CRB\HC.05\Brown1.grant.wpd

decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

## DISCUSSION

Brown claims that the Governor violated his right to due process because his reversal of the BPT's grant of parole is not supported by the evidence.  Specifically, Brown contends

G:\PRO-SE\CRB\HC.05\Brown1.grant.wpd

3

that the Governor's sole reliance on his commitment offense to deny him parole long after he served his minimum sentence does not constitute "some evidence" as required by due process.

Respondents argue that Brown does not have a constitutionally protected liberty interest in being released on parole, that due process and the "some evidence" standard do not apply in the parole context, and that the Governor adequately predicated his reversal of the BPT on "some evidence" even if due process applies.

A.   Due Process in the Parole Context

The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of life, liberty, or property without due process of law.  U.S. Const. amends. V, XIV. Contrary to respondent's position, it is now settled that California's parole scheme, codified in California Penal Code section 3041, vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause."  Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007) (citing Sass v. Calif. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillon v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002)).  Due process accordingly requires that a parole board premise its decision on "some evidence in the record" such that it is not arbitrary.  Sass, 461 F.3d at 1128-29 (quoting Superintendent v. Hill, 472 U.S. 445, 457 (1985)).  The "some evidence" standard is clearly established federal law in the parole context for purposes of § 2254(d).  Id. at 1129.

The Supreme Court set forth the "some evidence" standard in Superintendent v. Hill, which concerned the revocation of "good time" credits towards parole based on inmate misconduct.  472 U.S. at 455.  The Court rested its holding upon the foundation laid in Wolff v. McDonnell, 418 U.S. 539, 563-67 (1974).  As the Court noted, Wolff required, among other things, that an inmate receive "a written statement by the fact finder of the evidence relied on and the reasons" for the deprivation of his good time credits.  Hill, 472 U.S. at 454

G:\PRO-SE\CRB\HC.05\Brown1.grant.wpd

4

1  (citing Wolff, 418 U.S. at 565).  The Court then added to Wolff: "[R]evocation of good time
2  does not comport with 'the minimum requirements of procedural due process,' unless the
3  findings of the prison disciplinary board are supported by some evidence in the record."  Hill,
4  472 U.S. at 455 (quoting Wolff, 418 U.S. at 558).

5       The "some evidence" standard does not permit the court to "reweigh the evidence."
6  Powell v. Gomez, 33 F.3d 39, 42 (9th Cir. 1994).  Instead, the inquiry is "whether there is
7  any evidence in the record that could support the conclusion reached by the disciplinary
8  board."  Hill, 472 U.S. at 455-56.  While this test is minimally stringent, it must at minimum
9  protect an inmate's "strong interest in assuring that the loss of [parole] is not imposed
10  arbitrarily."  Id. at 454.

11       Due process also requires that the evidence underlying the parole board's decision
12  have some indicia of reliability.  Biggs, 334 F.3d at 915; McQuillion, 306 F.3d at 904.
13  Relevant in this inquiry is whether the prisoner was afforded an opportunity to appear before,
14  and present evidence to, the board.  See Pedro v. Oregon Parole Bd., 825 F.2d 1396, 1399
15  (9th Cir. 1987).

16  B.    State Parole Standards

17       California prescribes indeterminate sentences for non-capital murders: 25 years to life
18  for first degree murder and 15 years to life for second degree murder.  Cal. Penal Code § 190.
19  One year prior to the expiration of a prisoner's minimum sentence, a BPT panel meets with
20  the inmate and "set[s] a release date unless it determines that the gravity of current convicted
21  offense or offenses, or the timing and gravity of current or past convicted offense or offenses,
22  is such that consideration of the public safety requires a more lengthy incarceration."  Cal.
23  Penal Code § 3401(a).  Regardless of the length of time served, "a life prisoner shall be
24  found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose
25  an unreasonable risk of danger to society if released from prison."  15 Cal. Code Regs. §
26  2402(a).

G:\PRO-SE\CRB\HC.05\Brown1.grant.wpd

5

California's parole scheme requires that both the Governor and the BPT have "some evidence" that the inmate will be a continuing threat to society in order to deny parole. See In re Dannenberg, 34 Cal. 4th 1061, 1095 (2005)

C.   State Proceedings

The record shows that when the BPT convened on September 28, 2004 to review Brown's case, it took a holistic view of the record.  Although it had denied Brown parole nine times previously, the BPT found Brown to be suitable for parole in 2004 because he showed ample signs of rehabilitative progress over the course of his incarceration, which had almost reached 25 years at that point.  Resp't Answer Ex. 2 at 57-60.  In addition to pointing out that Brown had no significant prior history of violent crime and had been disciplinary-free for the last 15 years, the BPT noted that Brown had obtained his G.E.D., participated in numerous self-help programs, showed signs of remorse, and had been evaluated by a psychiatrist as having a violence potential no greater than the average citizen's.  Id. at 58-59.  The BPT weighed these factors against the aggravating nature of Brown's offense, particularly that he had an opportunity to abort the murder, that he used a firearm, and that the crime was connected with other criminal activity.  Id. at 60.  The BPT concluded that the good outweighed the bad.  Id. at 57.

Unlike the BPT, the Governor premised his decision solely on Brown's commitment offense.  While the Governor discussed in narrative form some presumably negative aspects of Brown's past criminal history and prison record, he did not in any way tie this discussion to his analysis; he did not identify these factors as negative or as weighing against Brown's release.  Resp't Answer Ex. 5 at 2.  The Governor noted, as did the BPT, that Brown's significant work "to enhance his ability to function within the law" during his time in prison, which at that point surpassed 25 years, weighed in favor of his release.  Id. at 2, 3.  He nonetheless found that Brown's commitment offense was "an especially heinous second-degree murder" and that "Brown's actions exceeded the minimum necessary for a second-degree murder conviction."  Id.  The Governor determined that, although Brown was

G:\PRO-SE\CRB\HC.05\Brown1.grant.wpd

6

1 acquitted of robbery and first-degree felony murder, "the facts in the record indicate that Mr.
2 McLucas was murdered in connection with a robbery[.]"  Id.  The Governor concluded that
3 based on "[t]he gravity of this atrocious murder alone . . . Brown would presently pose an
4 unreasonable risk to public safety[.]"  Id. at 3.  Consequently, he reversed the BPT's grant of
5 parole.  Id.

6 On May 24, 2005, the Superior Court of the State of California in and for the County
7 of Ventura considered Brown's petition for a writ of habeas corpus challenging the
8 Governor's decision.  The court denied the petition on the ground that "some evidence" in the
9 record supported the Governor's decision.  Resp't Answer Ex. 9 at 2.  The court characterized
10 the Governor's decision as based unequivocally and exclusively on Brown's commitment
11 offense.  Id.  It affirmed the Governor's right to reach conclusions contrary to the jury's
12 verdict – specifically regarding whether Brown committed a robbery – in evaluating the
13 commitment offense so long as some evidence in the record supported those conclusions, and
14 determined that the Governor's reliance on the commitment offense satisfied the some
15 evidence standard.  Id.  The California Court of Appeal and Supreme Court of California
16 summarily denied Brown's subsequent petitions for state habeas relief.  See Resp't Answer
17 Exs. 11 & 13.

18 D.   Analysis

19 The critical issue in this case is whether Brown's commitment offense alone can
20 satisfy the "some evidence" standard more than 25 years after he committed the offense.
21 Under the circumstances of this case, the court is satisfied that it cannot.

22 The Ninth Circuit's recent opinion in Irons shed some light on whether reliance on an
23 immutable factor such as the commitment offense violates due process.  Although the court
24 affirmed the BPT's denial of parole for Irons, it made clear that "indefinite detention based
25 solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will
26 at some point violate due process, given the liberty interest in parole that flows from the
27 relevant California statutes."  Irons, 479 F.3d at 665 (citation and footnote omitted).  In two
28

G:\PRO-SE\CRB\HC.05\Brown1.grant.wpd

1  earlier cases, Biggs and Sass, the court had also affirmed the BPT's denial of parole, but
2  made contradictory observations on the effect of continued denial of parole based solely on
3  unchanging factors such as the inmate's commitment offense and/or prior criminal history.
4  Compare Biggs, 334 F.3d at 917 ("continued reliance in the future on an unchanging factor,
5  the circumstance of the offense and conduct prior to imprisonment, runs contrary to the
6  rehabilitative goals espoused by the prison system and could result in a due process
7  violation") with Sass, 461 F.3d at 1129 ("it is not our function to speculate about how future
8  parole hearings could proceed"). Irons limited the holdings of Biggs, Sass and itself to
9  inmates deemed unsuitable prior to the expiration of their minimum sentences and held the
10 door open for inmates deemed unsuitable after the expiration of their minimum sentences:
11 "All we held in [Biggs and Sass,] and all we hold today, . . . is that, given the particular
12 circumstances of the offenses in these cases, due process was not violated when these
13 prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms."
14 Id.  Brown was deemed unsuitable by the Governor more than ten years after the expiration
15 of his 15-year minimum sentence.

16        Biggs, Sass and Irons resemble one another factually.  All three involved inmates who
17 had not yet served their minimum prison sentences, and all three involved convicted
18 murderers, although the severity of each offense differed.  In all three cases, the BPT relied
19 solely on the inmate's immutable commitment offense and/or prior criminal history in
20 denying parole.

21        Biggs presented the most serious offense of the three.  Biggs was convicted of first-
22 degree felony murder for participating in a 1981 plot to kill a witness in a criminal
23 proceeding against his employer.  Biggs, 334 F.3d at 912.  While Biggs refused to actually
24 kill the victim, he lured the victim into a trap, "was present at the location during the murder,
25 paid money to the co-conspirators, and returned with the killers in an attempt to better
26 conceal the body."  Id. at 912, 916.  Biggs was convicted for first-degree murder and
27 sentenced to 25 years to life in prison with the possibility of parole.  Id. at 912.
28

G:\PRO-SE\CRB\HC.05\Brown1.grant.wpd

8

Sass' offense was less grave, despite the numerosity of his convictions. In 1988, after causing a fatal automobile accident while driving under the influence of alcohol, Sass was convicted of second-degree murder, gross vehicular manslaughter, hit-and-run death, causing injury while driving under the influence, and felony drunk driving. Sass, 461 F.3d at 1125, 1130. Leading up to the commitment offense, Sass had seven DUI's. Id. at 1130, n.1. Sass was sentenced to 15 years to life in prison with the possibility of parole. Id. at 1130.

Irons' offense falls somewhere between those in Biggs and Sass. In 1985,

> Irons was living in the home of a couple, with another tenant, John Nicholson. The couple suspected that Nicholson was dealing drugs and was stealing from them. Irons shared their suspicions. He confronted Nicholson and an angry argument ensued in which Nicholson denied responsibility for the thefts. Irons went to his room, retrieved his gun, and then went to Nicholson's room where he fired 12 rounds into Nicholson and, after Nicholson complained that he was in pain, stabbed him twice in the back. He then wrapped Nicholson's body in a sleeping bag and left it in the room for the ten days it took him to procure a car. Irons then took the body to the coast, weighed it down, and disposed of it in the ocean.
>
> When the police found the body their investigation led them to . . . arrest the owner of the house. Irons intervened, explained to the police that they had the wrong person, and confessed to the killing.

Irons, 479 F.3d at 660. Irons was convicted of second-degree murder and sentenced to 17 years to life in prison with the possibility of parole. Id. Prior to his conviction, he had no criminal record. Id.

Even under the Governor's version of the facts, much distinguishes this case from Biggs, Sass and Irons, and pushes it beyond the point at which sole reliance on the commitment offense may be said to comport with due process. For one, Brown's offense in of itself is objectively less probative of future recidivism and continuing danger to society than the offenses in Biggs, Sass and Irons.

In Biggs, the petitioner engaged in a murderous plot to save his employer from prosecution and perpetuate his criminal activity; Biggs demonstrated an anti-social willingness to not only participate in and conceal a murder, but also to disrupt the criminal justice system that protects society against such crimes. Because the murder resulted from callous forethought and conspiracy, Biggs demonstrated a lack of a moral compass that

G:\PRO-SE\CRB\HC.05\Brown1.grant.wpd

9

1  would endanger society were he released.  In Sass, the petitioner killed someone as a result
2  of his alcoholism and despite his having received  seven prior DUI's; only a total recovery
3  from his substance abuse could ensure society's safety upon his release.  In Irons, while the
4  petitioner eventually turned himself in, he callously stabbed his victim after complaining of
5  his twelve gunshot wounds and then carried out a plan over the course of ten days to dispose
6  of the body.  Though arguably less severe than Biggs's crime, Irons' crime suggests a similar
7  lack of a moral compass.

8       In the instant case, while a modicum of forethought was involved, there is no evidence
9  in the record, nor does the Governor suggest, that Brown intended to kill his victim as in
10 Biggs.  And while Biggs's motive was to sabotage a criminal prosecution, which is among
11 the most dubious motives possible,  Brown sought only to recoup his gambling losses.
12 Unlike in Sass, Brown has no, let alone seven, similar offenses on his record.  And unlike in
13 Irons, Brown did nothing so callous as firing twelve rounds into his victim and then stabbing
14 him to quiet his complaining.  Brown made no effort to conceal his crime; he almost
15 immediately turned himself in.  In sum, Brown's offense was not the ultimate and most
16 serious of a long string of similar crimes as was the case in Sass, nor does Brown's offense
17 suggest the lack of a moral compass exhibited in Biggs and Irons.

18      Another critical difference between this case and Biggs, Saas and Irons is that Brown
19 has served a substantial amount of time beyond his minimum sentence.  This court must
20 consider that at some point after an inmate has served his minimum sentence the probative
21 value of his commitment offense as an indicator of "unreasonable risk of danger to society"
22 recedes below the "some evidence" required by due process to support a denial of parole.
23 See Irons, 479 F.3d at 665.  A decision to revoke parole based solely on an inmate's
24 commitment offense that can no longer be considered probative of dangerousness to society
25 would be arbitrary and not comport with the "some evidence" standard.  See Hill, 472 U.S. at
26 545-55, 457.  This is one of those cases.  When the Governor reversed the BPT's grant of
27 parole (and the state courts affirmed his decision) in 2005, Brown had served more than 25
28

G:\PRO-SE\CRB\HC.05\Brown1.grant.wpd

10

years in prison and exceeded his 15-year minimum sentence by more than ten years.[1] Needless to say, Brown's lengthy detention has diminished the probative value of his commitment offense. In fact, not only has Brown's incarceration eclipsed his 15-year minimum term for second-degree murder, but it also has eclipsed the 25-year minimum term he would have received had he been convicted of felony first-degree murder, as the Governor suggested he should have been.

Petitioner's commitment offense would be a sufficient basis to deny his parole if it indicated a risk of re-offending and of a danger to society. It does not. What underlies petitioner's commitment offense is a series of exercises in poor judgment: He bet $500 in a card game, lost that card game, used the threat of force to recoup his losses, and wound up shooting McLucas to death. Whether petitioner is currently dangerous enough to society to preclude his parole depends on whether his judgment is likely to fail him as gravely as it did when he embarked on the series of events that led him to kill McLucas in 1979. By itself, however, Brown's exercise of poor judgment at age 22 is not probative, absent any more recent indicators, of his exercise of poor judgment again at his nearing the age of 50. Not only did the Governor and state courts fail to point to any such indicators, but Brown's ultimately positive prison record over the past two and a half decades indicates, as the BPT concluded, that he is suitable for parole.

## CONCLUSION

After careful review of the record and pertinent law, the court is satisfied that the Governor's decision to revoke the BPT's grant of parole was arbitrary and did not comport with the some evidence standard. The state court's determination that the Governor's sole reliance on Brown's commitment offense satisfied the "some evidence" standard was an

---

[1] Brown has now served more than 27 years in prison.

G:\PRO-SE\CRB\HC.05\Brown1.grant.wpd

11

objectively unreasonable application of Hill.  See 28 U.S.C. § 2254(d).  Brown is entitled to federal habeas relief on his due process claim.[2]

Brown's petition for a writ of habeas corpus is GRANTED.  Respondent must release Brown on parole within **10 days** of the date of this order.  Within **20 days** of the date of this order, respondent must also file a notice with the court confirming the date on which Brown was released.

SO ORDERED.

Dated:   May 2, 2007

CHARLES  R. BREYER
United States District Judge

---

[2] Because Brown is entitled to relief on his due process claim, the court need not consider the ex post facto claim he raised in the alternative.

G:\PRO-SE\CRB\HC.05\Brown1.grant.wpd        12